**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| DONALD J. BEACH, SCOTT HANSEN, JEFFREY L. STOLOFF, BURNETTA NIMONS, THOMAS SCHOLTENS, NATALIE TRUEWORTHY, and JAMIE KHAN, Individually And On Behalf Of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> ATLAS VAN LINES, INC., ATLAS WORLD GROUP, INC., ALLIED VAN LINES, INC., NORTH AMERICAN VAN LINES, INC., SIRVA, INC., SIRVA WORLDWIDE, INC., MAYFLOWER TRANSIT, LLC, UNITED VAN LINES, LLC, UNIGROUP, INC., BEKINS VAN LINES, LLC, WHEATON VAN LINES, INC., AMERICAN MOVING AND STORAGE ASSOCIATION,  INC. AND JOHN DOES I-X, <br><br> Defendants. | Case No.: 2:07-_____ <br><br><br> **COMPLAINT** <br><br> **CLASS ACTION** <br><br> **(DEMAND FOR JURY TRIAL)** |

Plaintiffs, on behalf of themselves and all others similarly situated, bring this action against Defendants for treble damages under the federal antitrust laws of the United States, Section 1 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 1 ("Sherman Act") and Section 4 of the Clayton Antitrust Act of 1914, 15 U.S.C. § 15 ("Clayton Act") as well as for recovery pursuant to Section 14704 of the ICC Termination Act of 1995, 49 U.S.C. § 14704 ("ICCTA") of unreasonable, excessive, and unlawful rates charged by Defendants.   Plaintiffs complain and allege, upon information and belief, except as to those paragraphs applicable to the named Plaintiffs, which are based on personal knowledge, as follows:

## NATURE OF THE ACTION

1.     This action arises from a conspiracy to unlawfully fix, peg, raise, maintain, and/or stabilize prices for "Fuel Surcharges" by Defendants, individually and through their agents ("Carriers"), charged to persons who purchase "Household Goods Moving Services" from them. The Carriers represent that such "Fuel Surcharges" represent the actual increased cost of fuel and are being passed along to the consumer only to compensate the Carriers for the increased costs of fuel over and above a base fuel rate.  In fact, the Carriers have been calculating the "Fuel Surcharge" in a manner that is deliberately designed to hide hundreds of millions of dollars in profits that are being falsely represented as "costs."

2.     Plaintiffs, on behalf of all persons and entities who purchased Household Goods Moving Services for interstate moves from any of the Defendants and their co-conspirators or any predecessor, subsidiary, or affiliate of each, at any time during the four years prior to the date of filing of this action (the "Class"), bring this action to recover treble damages for violations of the aforesaid United States antitrust laws, as well as for recovery pursuant to 49 U.S.C. §14704(b) of amounts charged by Defendants in excess of the rates contained in their published tariff.

3.     At all relevant times herein, Defendants conspired to charge "Fuel Surcharges" to customers in the United States who purchased Household Goods Moving Services for interstate moves.  As further alleged herein, during at least the period of four years prior to the filing of this action (the "Class Period"), Defendants agreed, combined, and conspired with each other to fix, peg, raise, maintain, and/or stabilize illegal "Fuel Surcharges."  As a result of Defendants' unlawful conduct and conspiracy, Plaintiffs and the other members of the Class paid artificially high and unlawful "Fuel Surcharges" and have been damaged thereby.

2

## JURISDICTION AND VENUE

4.　This Complaint is brought against Defendants under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and the costs of this suit, including reasonable attorneys' fees, for the damages sustained by Plaintiffs and the members of the Class by reason of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, as well as under 49 U.S.C. § 14704 of the ICCTA to recover amounts paid by Plaintiffs in excess of rates contained in Defendants' published tariff.

5.　This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, Sections 4(a) and 15 of the Clayton Act, 15 U.S.C. §§ 15(a), and Section 14704(c)(1) of the ICCTA, 49 U.S.C. § 14704(c)(1).

6.　This Court has *in personam* jurisdiction over each of the Defendants, as each was engaged in an illegal price-fixing scheme and conspiracy that was directed at and/or caused damages to persons and entities residing in, located in, or doing business throughout the United States including the District of South Carolina.

7.　Venue is proper in this judicial district pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) and (c) because during the Class Period Defendants resided, transacted business, were found, or had agents in this district, and because a substantial part of the events giving rise to Plaintiffs' claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in the District of South Carolina.

8.　No other forum would be more convenient for the parties and witnesses to litigate this action.

## PARTIES

9.　Plaintiff Donald J. Beach is a citizen and resident of the State of South Carolina. Plaintiff purchased moving and storage services from the Defendant Atlas Van Lines, Inc., and paid the "fuel surcharge" set by the unlawful actions of all Defendants.

10.     Plaintiff Scott Hansen is a citizen and resident of the State of South Carolina.  Plaintiff purchased moving and storage services from the Defendant Allied Van Lines, Inc., and paid the "fuel surcharge" set by the unlawful actions of all Defendants.

11.     Plaintiff Jeffrey L. Stoloff s a citizen and resident of the State pf South Carolina.  Plaintiff purchased moving and storage services from the Defendant Wheaton Van Lines, Inc., and paid the "fuel surcharge" set by the unlawful actions of all Defendants.

12.     Plaintiff Burnetta Nimons is a citizen and resident of the State of South Carolina.  Plaintiff purchased moving and storage services from the Defendant Wheaton Van Lines, Inc., and paid the "fuel surcharge" set by the unlawful actions of all Defendants.

13.     Plaintiff Thomas Scholtens is a citizen and resident of State of South Carolina.  Plaintiff purchased moving and storage services from the Defendant Mayflower Transit, LLC, and paid the "fuel surcharge" set by the unlawful actions of all Defendants.

14.     Plaintiff Natalie Trueworthy is a citizen and resident of the State of South Carolina.  Plaintiff purchased moving and storage services from the Defendant United Van Lines, LLC, and paid the "fuel surcharge" set by the unlawful actions of all Defendants.

15.     Plaintiff Jamie Khan is a citizen and resident of the State of South Carolina.  Plaintiff purchased moving and storage services from the Defendant North American Van Lines, LLC, and paid the "fuel surcharge" set by the unlawful actions of all Defendants.

16.     Defendant Atlas Van Lines, Inc. ("Atlas") is a corporation organized pursuant to the laws of Delaware with its principal place of business in Evansville, Indiana.  Atlas is a wholly owned subsidiary of Atlas World Group, Inc.

4

Atlas provides interstate transportation of Household Goods throughout the United States. Atlas is a member of the American Moving and Storage Association, Inc. ("AMSA") and is a member of AMSA's Certified Moving Program. Mike L. Shaffer, Chairman and Chief Executive Officer of Atlas, is an officer of AMSA. Marian Weilert Sauvey, General Counsel, Senior Vice President and Secretary of Atlas, is Chairman of the AMSA Legal Advisory Council.

17.     Defendant Atlas World Group, Inc. ("Atlas World Group") is a corporation organized pursuant to the laws of Delaware with its principal place of business is Evansville, Indiana. Atlas World Group is the parent corporation of Atlas. Through its subsidiary Atlas, Atlas World Group provides interstate transportation of Household Goods throughout the United States. Mike L. Shaffer, Chairman and Chief Executive Officer of Atlas World Group, is an officer of AMSA. Marian Weilert Sauvey, General Counsel, Senior Vice President and Secretary of Atlas World Group, is Chairman of the AMSA Legal Advisory Council.

18.     Defendant Allied Van Lines, Inc. ("Allied") is a corporation organized pursuant to the laws of Delaware with its principal place of business in Westmont, Illinois. Allied is a wholly owned subsidiary of North American Van Lines, Inc. Allied provides interstate transportation of Household Goods throughout the United States. Allied is a member of AMSA and is a member of AMSA's Certified Moving Program.

19.     Defendant North American Van Lines, Inc. ("North American") is a corporation organized pursuant to the laws of Delaware with its principal place of business in Fort Wayne, Indiana. North American is the parent corporation of Allied and is a wholly owned subsidiary of SIRVA Worldwide, Inc. North American provides interstate transportation of Household Goods throughout the United States. North American is a member of AMSA and is a member of AMSA's Certified Moving Program.

20.     Defendant SIRVA, Inc. ("SIRVA") is a corporation organized pursuant to the laws of Delaware with its principal place of business in Westmont, Illinois.  SIRVA, Inc. is a parent corporation of SIRVA Worldwide, Inc.

21.     Defendant SIRVA Worldwide, Inc. ("SIRVA Worldwide") is a corporation organized pursuant to the laws of Delaware with its principal place of business in Westmont, Illinois.  SIRVA Worldwide is the parent corporation of North American, which is the parent corporation of Allied.  Through its subsidiaries, North American and Allied, SIRVA Worldwide provides interstate transportation of Household Goods throughout the United States and participates in and benefits from all decisions made by AMSA and its members.

22.     Defendant Mayflower Transit, LLC ("Mayflower") is a limited liability company organized pursuant to the laws of the State of Missouri with its principal place of business in Fenton, Missouri.  Mayflower is a wholly owned subsidiary of UniGroup, Inc. and an affiliate of United Van Lines, LLC.  Mayflower provides interstate transportation of Household Goods throughout the United States.  Mayflower is a member of AMSA and is a member of AMSA's Certified Moving Program.  Pat Larch, President and Chief Operating Officer of Mayflower, serves on the executive committee of AMSA and is Chairman of the Household Goods Carriers Bureau.

23.     Defendant United Van Lines, LLC ("United") is a limited liability company organized pursuant to the laws of Missouri with its principal place of business in Fenton, Missouri.  United is a wholly owned subsidiary of Unigroup, Inc. and an affiliate of Mayflower.  United provides interstate transportation of Household Goods throughout the United States.  United is a member of AMSA and is a member of AMSA's Certified Moving Program.  Pat Larch, President and Chief Operating Officer of United, serves on the executive committee of AMSA and is Chairman of the Household Goods Carriers Bureau.

24.     Defendant Unigroup, Inc. ("Unigroup") is a corporation organized pursuant to the laws of Missouri with its principal place of business in Fenton, Missouri. Unigroup is the parent corporation of Mayflower and United. Through its subsidiaries Mayflower and United, Unigroup provides interstate transportation of Household Goods throughout the United States. Gerry Stadler, Chairman and Chief Executive Officer of Unigroup, serves on the board of AMSA.

25.     Defendant Bekins Van Lines, LLC. ("Bekins") is a limited liability company organized pursuant to the laws of the State of Delaware and provides interstate transportation of Household Goods throughout the United States. Bekins participates in and benefits from all decisions made by AMSA and its members.

26.     Defendant Wheaton Van Lines, Inc. ("Wheaton") is a corporation organized pursuant to the laws of the State of Indiana and provides interstate transportation of Household Goods throughout the United States. Wheaton participates in and benefits from all decisions made by AMSA and its members.

27.     Defendant American Moving and Storage Association, Inc. is a corporation organized pursuant to the laws of the State of Virginia with its headquarters located in Alexandria, Virginia, organized for purposes of, *inter alia*, providing a mechanism to the other Defendants to unlawfully conspire to unlawfully fix, peg, raise, maintain and/or stabilize prices for "Fuel Surcharges."

## UNNAMED CO-CONSPIRATORS

28.     On information and belief, at all relevant times, other Household Goods Carriers, trade groups, or other entities, referred to herein as John Does I-X, and each of whom was a member of AMSA at all times material hereto, willingly conspired with Defendants in their unlawful restraint of trade. All averments herein against named Defendants are also averred against these unnamed co-conspirators as though set forth at length.

7

**DEFENDANTS' AGENTS**

29.     The acts alleged to have been done by Defendants were authorized, ordered or done by their directors, officers, agents, employees, subsidiaries, or representatives while actively engaged in the management of each of the Defendants' affairs, on behalf of and for the benefit of Defendants, as co-conspirators, and against Plaintiffs' class, each of whom were direct purchasers of the services set forth herein.

30.     Each of the Defendants acted for itself and by and through its local agents, who transport goods for it and under its name. As such, each Defendant is responsible for all acts or omissions of any of its agents which relate to the performance of household goods transportation services which are within the actual or apparent authority of the agent from the carrier or which are ratified by the carrier pursuant to 49 U.S.C. § 13907.  The acts complained of herein have been within the apparent authority of the Defendants, have been to their benefit, and have been ratified by Defendants.

**CLASS ACTION ALLEGATIONS**

31.     Plaintiffs bring this action on their own behalf and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the following Class:

> All individuals or entities (excluding governmental entities, Defendants, and Defendants' parents, predecessors, subsidiaries, affiliates, agents and Defendants' co-conspirators) who purchased Household Goods Moving Services for interstate shipments directly from any of the Defendants, Defendants' co-conspirators, or Defendants' predecessors, subsidiaries, affiliates or agents, at any time during the period within four years prior to the filing of this action.

32.     Because such information is in the exclusive control of Defendants, Plaintiffs do not know the exact number of Class members.  Due to the nature of the trade and commerce involved, however, Plaintiffs believe that Class members number at least in the thousands and are sufficiently numerous and so

8

geographically dispersed throughout the United States that joinder of all Class members is impracticable.

33.     There are questions of law or fact common to the Class, including:

a.     Whether Defendants engaged in a combination or conspiracy among themselves to unlawfully fix, peg, raise, maintain, and/or stabilize Fuel Surcharge prices charged for interstate moves within the United States;

b.     The duration of the conspiracy alleged in this Complaint, and the nature and character of the acts performed by Defendants in furtherance of the conspiracy;

c.     Whether the alleged conspiracy violated Section 1 of the Sherman Act;

d.     Whether the Fuel Surcharge agreed to and implemented by Defendants was unlawful;

e.     The effect of Defendants' conspiracy on the Fuel Surcharge prices charged for interstate moves within the United States during the Class Period;

f.     Whether the conduct of Defendants, as alleged in this Complaint, caused damages to the Plaintiffs and the other members of the Class; and

g.     The appropriate measure of damages sustained by Plaintiffs and other members of the Class.

34.     Each Plaintiff is a member of the Class.  Each Plaintiff's claims are typical of the claims of the Class members.  Each Plaintiff will fairly and adequately protect the interests of the Class.  Each Plaintiff paid "Fuel Surcharges" directly to one or more Defendants, and its interests are coincident with and not antagonistic to those of other members of the Class.  Each Plaintiff is represented by counsel competent and experienced in the prosecution of complex litigation, including class action litigation.

35.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members.

36. A class action is superior to other methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment is necessary to permit adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint. This class action presents no difficulties in management that would preclude maintenance as a class action. Finally, the Class is readily definable and is one for which records of the names and addresses of the members of the Class exist in the files of Defendants.

## INTERSTATE TRADE AND COMMERCE

37. The national market for Household Goods shipping is estimated to be in excess of $3 billion annually.

38. Throughout the Class Period, there was a continuous and uninterrupted flow of transactions by Defendants in interstate commerce throughout the United States.

39. Defendants' unlawful activities, as described herein, took place within the flow of interstate commerce between Defendants and Plaintiff class members who were located in states other than the states in which Defendants are located, and had a direct, substantial, and reasonably foreseeable effect upon interstate commerce.

## DEFENDANTS AND THE HOUSEHOLD GOODS SHIPPING MARKET

40. According to the AMSA, in 2004, the national market for the interstate transport of Household Goods was in excess of $3 billion with over a million individual moves. Defendants are among the largest interstate Household Goods Carriers in the United States. In 2003, Defendants together handled nearly 85% of the national market:

a.      Defendant Atlas ranked number four with 11% of the market;

b.      Defendant Allied ranked number five with 11% of the market;

c.      Defendant North America ranked number two with 15.4% of the market;

d.      Defendant Mayflower ranked number three with 11.1% of the market; and

e.      Defendant United ranked number one with 30.7% of the market.

f.      Defendant Bekins ranked number six with 4.5% of the market.

g.      Defendant Wheaton ranked number twelve with 1.5% of the market.

41.     The Defendants are each other's principal competitors in the national Household Goods Moving Services market.

42.     Household Goods Moving Services are fungible in the sense that Household Goods Moving Services provided by any one Household Goods Carrier are readily substitutable for the Household Goods Moving Services provided by any other Household Goods Carrier.

43.     Household Goods Moving Services are homogenous services sold by Household Goods Carriers, including Defendants, to Household Goods shipping customers, including Plaintiffs and the members of the Class, primarily based on price.

44.     The Household Goods Moving Services market in the United States is highly concentrated, and there exist substantial barriers to entry in this market. Both factors facilitate the implementation and maintenance of a horizontal price-fixing cartel such as that perpetrated by Defendants and alleged herein.

## DEFENDANT AMSA FACILITATED THE CONSPIRACY

45. AMSA is a trade association whose members number over 3200 entities nationwide.

46. AMSA is the exclusive trade association for the Moving and Storage industry and, as such, publishes tariffs. All of its members agree to be bound by the tariffs and to charge the moving public the rates contained in the tariffs under the terms and conditions specified therein. The tariff that controls rates and "Fuel Surcharges" is called 400-N.

47. AMSA was aware of the "Fuel Surcharge" conspiracy, and participated in, coordinated, facilitated, and/or ratified the conspiracy and the illegal acts of the Household Goods Carrier Defendants as averred herein.

48. At all times in all matters relevant hereto, AMSA acted as the Attorney in Fact for each Defendant.

## THE STATUTORY SCHEME GOVERNING INTERSTATE TRANSPORTATION OF HOUSEHOLD GOODS

49. Transportation of Household Goods by the carriers in the moving and storage industry is regulated by Title 49 U.S.C. Subtitle IV Part B Chapter 137 and Chapter 147.

50. Pursuant to 49 U.S.C. § 13701, rates, rules and practices related to the transportation of household goods must be "reasonable."

51. Pursuant to 49 U.S.C. § 13702(a), interstate carriers of household goods are required to maintain and publish accurate tariffs that contain the rates for the services they offer. These tariffs must be available for inspection by the Surface Transportation Board ("STB", or "Board") and by the public. It is illegal to charge more

than the rate specified in a published tariff or to enter into agreements to charge more than the amount specified in such a tariff. 49 U.S.C. § 13702(c) provides:

**(c) Tariff Requirements for Household Goods Carriers.—**

**(1) In general. —** A carrier providing transportation described in subsection (a)(2) shall maintain rates and related rules and practices in a published tariff. The tariff must be available for inspection by the Board and be made available for inspection by shippers upon reasonable request.

**(2) Notice of availability. —** A carrier that maintains a tariff under this subsection may not enforce the provisions of the tariff unless the carrier has given notice that the tariff is available for inspection in its bill of lading or by other actual notice to individuals whose shipments are subject to the tariff.

**(3) Requirements. —** A carrier that maintains a tariff under this subsection is bound by the tariff except as otherwise provided in this part. A tariff that does not comply with this subsection may not be enforced against any individual shipper.

52.    Household goods carriers may collectively agree in a restricted number of circumstances to fix and adjust rates without being in violation of United States antitrust laws when they act pursuant to an agreement submitted to and approved by the STB as being in the public interest. Any other concerted action has no antitrust immunity and may violate the Sherman and/or Clayton Acts. The agreements that are eligible for the antitrust exemption are set forth in 49 U.S.C. § 13703 as follows:

**13703. Certain collective activities; exemption from antitrust laws**

**(a) Agreements. —**
**(1) Authority to enter. —** A motor carrier providing transportation or service subject to jurisdiction under chapter 135 may enter into an agreement with one or more such carriers to establish —
**(A)** through routes and joint rates;

        **(B)** rates for the transportation of household goods;

        **(C)** classifications;

        **(D)** mileage guides;

        **(E)** rules;

        **(F)** divisions;

        **(G)** <u>**rate adjustments of general application**</u> <u>**based on industry average carrier costs**</u> (so long as there is no discussion of individual markets or particular single-line rates); or

        **(H)** procedures for joint consideration, initiation, or establishment of matters described in subparagraphs (A) through (G).

(Emphasis added). This complaint concerns subsection G.

      53.    49 U.S.C. § 14704 provides a remedy to customers who are victims of unlawful rates, including the filing of civil actions:

**14704. Rights and remedies of persons injured by carriers or brokers**

        \*\*\*

**(b) Liability and Damages for Exceeding Tariff Rate.—** A carrier providing transportation or service subject to jurisdiction under chapter 135 is liable to a person for amounts charged that exceed the applicable rate for transportation or service contained in a tariff in effect under section 13702.

**(c) Election.—**

        **(1) Complaint to DOT or board; civil action.—** A person may file a complaint with the Board or the Secretary, as applicable, under section 14701 (b) or bring a civil action under subsection (b) to enforce liability against a carrier or broker providing transportation or service subject to jurisdiction under chapter 135.

<u>**DEFENDANTS' TARIFF 400-N**</u>

      54.    Pursuant to this statutory scheme, Defendants did enter into an Agreement to fix, peg, raise, maintain, and/or stabilize prices for their services. This Agreement was filed with the STB. Its prior approval by the Interstate Commerce Commission, the predecessor of the STB, was renewed by the STB. (Exhibit 1)

55.     The Agreement contained a provision which allowed the carriers to make "general rate increases or decreases," that is "rate adjustments", provided they are "limited to industry average carrier costs."

56.     Towards that end, the carriers promulgated a tariff, known as Tariff 400-N, (Exhibit 2) which each Defendant is required to publish and observe, and make available for inspection by potential customers.  Tariff 400-N was not filed with, nor approved by, the STB.

57.     In Defendants' Tariff 400-N, the total cost of a move, which is a result of differential pricing based on factors such as the shipper, weight, mileage, place of origin, and destination, and certain costs such as fuel, is referred to as the "transportation charge." Defendants refer to the "transportation charge" among themselves as the "linehaul charge."

## DEFENDANTS CONSPIRED TO FIX PRICES AND CHARGE AMOUNTS VASTLY IN EXCESS OF THEIR OWN APPROVED AGREEMENT AND PUBLISHED TARIFF BY USE OF THE FUEL SURCHARGE

58.     Tariff 400-N contains, among other things, certain provisions for a rate adjustment called a "Fuel Surcharge."

59.     Defendants use of the term "Fuel Surcharge" to characterize the "rate adjustment" in Tariff 400-N suggests that it is a charge to recover only the increased fuel costs associated with the movement of household goods to which it is applied, and compensates them only for the actual increase in the cost of fuel above the base cost of fuel that is already included in the transportation charge.

60.     The method by which Defendants agreed and conspired to calculate these "Fuel Surcharges" is set forth in a formula that sets the fuel surcharge as a percentage of the entire transportation charge.  This practice is unreasonable and unlawful, and results in charges far in excess of the actual increased cost of fuel for that movement, and in excess of that cost represented by Defendants' published tariff.  The purported "Fuel Surcharge" is often greater than the entire cost of fuel already charged

consumers in the line item called the "transportation charge."  This rate adjustment is not based on industry average carrier cost.  In fact, this rate adjustment is grossly in excess of the adjustment permitted by the statute.

61.    Defendants knowingly violated the antitrust laws and the ICCTA to reach agreements and conspire to make rate adjustments of general application that were not based upon industry average carrier costs. In order to facilitate their illegal scheme, defendants published one "Fuel Surcharge" in Tariff 400-N for the public and the STB, and colluded to charge a different "Fuel Surcharge" pursuant to the scheme set forth above.  Item 16 of Tariff 400-N, describing the fuel surcharge rate adjustment, uses deliberately ambiguous and misleading language to suggest that the "Fuel Surcharge" is pegged at and restricted to Defendants' actual additional cost of fuel.  It states, in relevant part, as follows:

**PROFESSIONAL MOVERS COMMERCIAL RELOCATION TARIFF STB HGB 400-N
SECTION 1 – RULES AND REGULATIONS – 3RD REVISED PAGE 21**

**R ITEM 16 (Concluded)
FUEL COST PRICE ADJUSTMENT (SURCHARGE)**

2. If the first Monday of the calendar month is a Federal holiday, the price will be determined based on the stated DOE price available on the next subsequent business day (Tuesday)

3. The DOE fuel price obtained will then be indexed based on the fuel price/adjustment factor matrix set forth in this item to determine the Fuel Cost Price Adjustment that will become applicable on the fifteenth (15th) day of the same month. The adjustment determined will apply for shipments loaded on the 15th day of the month and remain in effect through the 14th day of the following month starting from the effective date of this item.

For example, if the reported price of self-service diesel fuel determined on Monday. June 5th is $1.599 per gallon, a 2.0

percent Fuel Cost Price Adjustment will apply for shipments loaded as of June 15th through July 14th. Then, if the reported price of diesel fuel on Monday, July 3rd increases to $1.749 per gallon, a three (3.0%) percent Fuel Cost Price Adjustment will apply for shipments loaded as of July 15th through August 14th.

**4. Notwithstanding any other provision of the tariff, the Fuel cost adjustment WILL APPLY to the transportation charges applicable on SIT shipments when such shipments are delivered to or removed from the storage-in-transit location during the period that a Fuel Surcharge is in effect.**

(Capitals in original) (emphasis added).

62.    By using the terms "WILL APPLY to the transportation charge" and setting forth their percentage increases in the cost of diesel fuel in their tariff, Defendants intended that consumers and the STB would conclude that they were adjusting their rates only to compensate for the actual increase in average Carrier fuel costs, and were therefore in compliance with the statutory provision permitting collective "rate adjustments of general application *based on industry average carrier costs*" as defined and  limited by 49 U.S.C. § 13703(a)(1)(G) (emphasis added) and required by their Agreement filed with the STB.

63.    Defendants conspired with each other, through AMSA, to mislead their consumers and the STB by publishing the method for determining the "Fuel Surcharges" described above, but disseminating amongst themselves for strictly internal use a more forthcoming description of how Defendants should determine "Fuel Surcharges," which would allow Defendants to charge amounts vastly in excess of their actual increased cost of fuel. The web site for AMSA members (www.promover.org) and the software AMSA sold to its members contain instructions to be used to calculate the tariffs.  The instructions on how to calculate and implement the unlawful fuel surcharge

are **not** published for consumers or filed with the STB.  Those instructions are set forth as follows:

### Item 16, Fuel Cost Price Adjustment - Surcharge

The following percentage Fuel-Related Cost Price Adjustment (Surcharge) will apply on linehaul transportation charges and transportation charges on shipments picked up and delivered into storage-in-transit, as described below:

1.      On the first Monday of each calendar month, the "national U.S. average" price of diesel fuel will be determined based on the price stated by the US Department of Energy (DOE), Energy Information Administration's (EIA) survey of "Retail On-Highway Diesel Prices." This price will be obtained by calling the DOE Fuel Hot Line at 202-586-6966 or via the DOE Internet web site at www.eia.doe.gov.

2.      If the first Monday of the calendar month is a Federal holiday, the price will be determined based on the stated DOE price available on the next subsequent business day (Tuesday).

3.      The DOE fuel price obtained will then be indexed based on the fuel price/adjustment factor matrix set forth in this item to determine the Fuel Cost Price Adjustment that will become applicable on the fifteenth (15th) day of the same month. The adjustment determined will apply for shipments loaded beginning on the 15th day of the month and remain in effect through the 14th day of the subsequent following month starting from the effective date of this item.

For example, if the reported price of self-service diesel fuel determined on Monday, June 5, 2000 is $1.259 per gallon, a two (2.0%) percent Fuel Cost Price Adjustment will apply for shipments loaded as of June 15, 2000 through July 14, 2000. Then, if the reported price of diesel fuel on Monday, July 3, 2000 increases to $1.379 per gallon, a three (3.0%) percent Fuel Cost Price Adjustment will apply for shipments loaded as of July 15, 2000 through August 14, 2000.

**4.      To determine the Fuel Cost Adjustment amount to apply, <u>multiply the applicable linehaul transportation charges</u> as determined in accordance with Sections 3, 5, 6, and 7, and the applicable pickup and delivery transportation charges on Storage-In-Transit shipments as determined in accordance with Items 210 and 410 of this tariff, <u>by the percentage Fuel Cost Adjustment Factor. The resulting charge is in addition to all other applicable transportation charges.</u>**

**For example, if the applicable linehaul transportation charge is $5,300, a two (2.0%) percent Fuel Cost Adjustment Factor would be $106.00.**

(Emphasis added)

| When the DOE Fuel Price Per Gallon reported on the first Monday of the month is: | The Fuel Cost Adjustment Factor that becomes effective on the 15th day of the same month is: |
|---|---|
| Less than $1.137 | 0% |
| From $1.137 to $1.235 | 1.0% |
| From $1.236 to $1.334 | 2.0% |
| From $1.335 to $1.434 | 3.0% |
| From $1.435 to $1.533 | 4.0% |
| From $1.534 to $1.632 | 5.0% |
| From $1.633 to $1.732 | 6.0% |
| From $1.733 to $1.831 | 7.0% |
| From $1.832 to $1.930 | 8.0% |
| From $1.931 to $2.029 | 9.0% |
| From $2.030 to $2.130 | 10.0% |
| From $2.131 to $2.230 | 11.0% |
| From $2.231 to $2.330 | 12.0% |
| From $2.331 to $2.430 | 13.0% |
| From $2.431 to $2.530 | 14.0% |
| From $2.531 to $2.630 | 15.0% |
| Over $2.630 | (See Note 1) |

Note 1: If the DOE fuel price per gallon exceeds $2.630, the 15% fuel surcharge, subject to paragraphs 1 through 4 herein, will be increased by an additional 1% for every 10 ($0.10) cents, or fraction thereof, per gallon increase in the price above $2.630 per gallon.

Note 2: Notwithstanding any other provisions of the tariff, the Fuel Cost Adjustment Factor WILL APPLY to transportation charges applicable on storage-in-transit shipments when such shipments are delivered to or removed from the storage-in-transit location during the period that the Fuel Cost Adjustment Factor is in effect.

Note 3: The Fuel Cost Adjustment Factor WILL BE SHOWN SEPARATELY from the linehaul revenue on carrier transportation documents for the purpose of identifying the amount as special fuel-related revenue.

Note 4: Fractions obtained in the calculation of the Fuel Cost Adjustment Factor

will be disposed of as provided in Item 21 of this tariff.

Thus, in their instructions to their members on how to charge for fuel they agreed that the "Fuel Surcharge" should be determined as follows:

5. To determine the Fuel Cost Adjustment amount to apply, ***multiply*** the applicable ***linehaul transportation charges*** as determined in accordance with Sections 3, 5, 6, and 7, and the applicable pickup and delivery transportation charges on Storage-In-Transit shipments as determined in accordance with Items 210 and 410 of this tariff, ***by the percentage Fuel Cost Adjustment Factor***. The resulting charge is in addition to all other applicable transportation charges.

   **For example, if the applicable linehaul transportation charge is $5,300, a two (2.0%) percent Fuel Cost Adjustment Factor would be $106.00.** (Emphasis added)

      64.    By stating in the published tariff that the "Fuel Cost Adjustment will apply to the transportation charges," Defendants led the public and the STB to believe that Defendants were only adding to the customer's total bill the actual average increase in the cost of fuel. An "adjustment" for "fuel cost" implies that transportation charges will be increased solely to reflect the actual increase in that cost. However, the example provided to their members shows the percentage multiplied by the entire transportation charge to yield a number which is then added to the customer's bill. This method was deliberately omitted in the tariff, which instead published a different and intentionally misleading example:

      For example, if the reported price of self-service diesel fuel determined on Monday, June 5, 2000 is $1.259 per gallon, a two (2.0%) percent Fuel Cost Price Adjustment will apply for shipments loaded as of June 15, 2000 through July 14, 2000. Then, if the reported price of diesel fuel on Monday, July 3, 2000 increases to $1.379 per gallon, a three (3.0%) percent Fuel Cost Price Adjustment will apply for shipments loaded as of July 15, 2000 through August 14, 2000.

65.     Nowhere in the published tariff did Defendants reveal their separate and secret agreement, using different language, different instructions, and a different formula, to fix prices in a way that is not based on "industry average carrier costs," or in other words, to fix prices in a way that is not based on the actual, average increase in the cost of diesel fuel. The rate adjustments made pursuant to their actual agreement were not disclosed by their published tariff.

66.     The following example demonstrates how the scheme works:  A move from Washington D.C. to Charleston, S.C. involves approximately 1000 driving miles (500 miles each way), assuming the van is empty on the return trip. Industry records show that the average moving truck gets 5 miles to a gallon of diesel fuel. Assuming a hypothetical price of $3.00 per gallon, the moving company's entire fuel bill for the trip would be $600. (1000 miles ÷ by 5 mpg = 200 x $3.00 = $600.00) The moving company has already built in a charge for fuel in its original transportation charge. There is no separate charge for fuel. However, there is a separate charge for a "fuel surcharge".  Using the 400-N tariff formula of 15%, if the move in question had a transportation charge of $9,000.00, then the fuel surcharge would be $1,350.00 or more than twice the amount of the entire cost of the mover's fuel for the 1000 mile trip.  The consumer is being led to believe that the only additional charge on his bill is the mover's actual increase in the cost of his diesel fuel. Assuming that the percentage increase represents the actual industry average, that is the amount the carrier could agree with other carriers to recover under an agreement approved by the STB.  However, the Defendants conspired and agreed that instead of adding their increase in the cost of fuel to the transportation charge, they would multiply a percentage increase in the cost of fuel

by the *entire* transportation charge and add the resulting amount to the total charge. In the case set forth above they would multiply 15% x *$9,000.00 to yield a fuel surcharge that is more than double their actual cost of fuel.* Defendants, therefore, compute a Fuel Surcharge as a percentage of the transportation, or linehaul, charge, which has no relationship to the actual increased cost of fuel associated with the movement of goods. There is no nexus between the "Fuel Surcharge" actually charged and fuel consumption. Instead, it is used as a revenue enhancer.

### DEFENDANTS PROFITED FROM THE SURCHARGES

67.    Defendants jointly and collectively, in South Carolina and throughout the United States, profited from these unlawful rate adjustments designated as "Fuel Surcharges" in amounts totaling hundreds of millions of dollars, representing the difference between the actual cost attributable to the increase in their cost of fuel and the amounts they have unlawfully charged consumers.

### DEFENDANTS KNEW THAT THEIR FUEL SURCHARGE PRICE INCREASES WERE ILLEGAL, FUNDAMENTALLY FLAWED, UNFAIR TO SHIPPERS, AND ADVERSE TO THE PUBLIC INTEREST

68.    Defendants deliberately and knowingly adjusted their rates in a manner calculated to disguise profits as cost increases that should have been, but in this instance were not, reflective of rising "industry average carrier costs" for diesel fuel. In so doing, Defendants did not collectively make "rate adjustments of general application based on industry average carrier costs," as specified in 49 U.S.C. § 13703(a)(1)(G). Therefore, their conduct was not exempt from Federal Antitrust Laws.

69.    Defendants engaged in a practice that was unlawful when they conspired to charge a rate greatly in excess of "industry average carrier costs," all as prohibited by 49 U.S.C. § 13701.

70.     The Defendants knew that they were acting unlawfully in violation of 49 U.S.C. §§ 13702, 13703, 14704, and 14903 set forth above when they entered into their side agreement and concealed it from the shipping public and the STB.

71.     In September of 1999, motor carrier shippers initiated an action before the STB contending that motor carrier rate bureaus acted unlawfully in agreeing to propose General Rate Increases (GRIs) that far exceeded their cost increases and therefore were not permitted "rate adjustments of general application based on industry average carrier costs" under 49 U.S.C. § 13703(a)(1)(G).  The shippers asserted that many carriers were already "recovering increased fuel costs through fuel surcharges" and that to the extent the proposed GRIs reflected increased fuel costs, the "carriers will be recovering twice for the same fuel cost increase."  Because of its concern "about the reasonableness of the proposed GRIs," the STB decided to suspend and investigate them. *In re* Protests and Petitions for Suspension and Investigation of General Rate Increases, STB Docket No. ISM 35006 (Exhibit 3).  On October 8, 1999, the rate bureaus notified the STB that the rates under investigation had been canceled.  On October 14, 1999, the STB decided that in view of the cancellation of the rates under investigation, the STB Docket No. ISM 35006 proceeding would be discontinued, effective on October 15, 1999 (Exhibit 4).

72.     In August of 2006, the STB gave notice that it would examine allegations of profiting through "Fuel Surcharges" by railroads. The railroads had been engaging in a practice identical to that of Defendants, multiplying the percentage increase in the cost of fuel by the shippers' entire transportation charge and adding the product to the transportation charge.  The STB opined then that the practice was unreasonable:

The carriers concede that most of their "Fuel Surcharges" are calculated as a percentage of the base rate. The record before us indicates that there is little, if any, correlation between an increase in the cost of fuel for an individual rail movement and the level of the base rate for that movement.  To the extent that a base rate is cost-based, it reflects substantial costs, including the costs of labor and of capital investments, that do not track rapid changes in fuel costs.

*In re* Rail Fuel Surcharges, STB Ex Parte No. 661 Rail. (Exhibit 5, p. 4)

73.    In January of 2007, the STB issued its final order in the railroad

fuel surcharge action, affirming its earlier action, and held, *inter alia*, as follows:

The Board instituted this proceeding to inquire into rail carrier practices related to fuel surcharges.  A fuel surcharge is a separately identified component of the total rate that is charged for the transportation involved, purportedly to recoup increases in the carrier's fuel costs.  The Board first held a hearing in May 2006, and in August 2006 it sought comments on several proposed measures to address the Board's concerns about these practices.  After considering all of the comments received, we conclude that computing rail fuel surcharges as a percentage of a base rate is an unreasonable practice, and we direct carriers to change this practice.
*       *       *
After considering all of the comments, we affirm the preliminary conclusion in the August decision that **it is an unreasonable practice to compute fuel surcharges as a percentage of the base rates.**  Because railroads rely on differential pricing, under which rates are dependent on factors other than costs, **a surcharge that is tied to the level of the base rate, rather than to fuel consumption for the movement to which the surcharge is applied, cannot fairly be described as merely a cost recovery mechanism.**  Rather, a fuel surcharge program that increases all rates by a set percentage stands **virtually no prospect of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied.**
*       *       *
But if a carrier chooses to use a fuel surcharge program, it must be based upon attributes of a movement that directly affect the amount of fuel consumed.  In other words, there must be a reasonable nexus to fuel consumption.

A fuel surcharge program keyed to the base rate has one primary benefit – ease of application.  Although clearly easy to implement, a fuel surcharge program keyed to the base rate almost guarantees that some shippers will be forced to pay the increased fuel costs of other shippers.  For carriers to continue to apply fuel surcharge programs that are

24

> calculated as a percentage of the base rate – when practical alternatives are available – would permit them to continue to mislead their customers and would be unfair.

*In re* Rail Fuel Surcharges, STB Ex Parte No. 661 (Exhibit 6, pp. 1, 6, and 9) (emphasis added).

## COUNT ONE: ANTI-TRUST VIOLATIONS

74.     Plaintiffs incorporate by reference, as if fully set forth herein, the allegations contained in the preceding paragraphs of the Complaint.

75.     During the Class Period, being four years prior to the filing hereof, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to artificially and unlawfully raise, peg, fix, maintain, and/or stabilize Fuel Surcharge prices for interstate moves in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

76.     In formulating and effectuating the alleged contract, combination, or conspiracy, Defendants engaged in anti-competitive activities, the purpose and effect of which was to artificially raise, fix, peg, maintain, and/or stabilize "Fuel Surcharges." These activities included the following:

> a.      agreeing to charge "Fuel Surcharges" at certain levels and otherwise to fix, raise, peg, maintain, and/or stabilize the "Fuel Surcharges" charged for interstate moves within the United States; and
>
> b.      charging "Fuel Surcharges" at the agreed-upon rates.

77.     During the Class Period, Defendants increased, as a ratio to external costs – and profits – the "Fuel Surcharges" they charged. These relative increases in "Fuel Surcharges" cannot be explained by, nor do they accurately reflect, the actual increase in industry average carrier cost of fuel but rather were the result of anticompetitive conduct.

78.     During the Class Period, Plaintiff and members of the Class paid "Fuel Surcharges" directly to Defendants, their agents, subsidiaries, and their controlled affiliates.

79.     The illegal combination and conspiracy alleged herein has had the following effects, among others:

       a.     price competition in the charging of "Fuel Surcharges" has been restrained, suppressed, and/or eliminated;

       b.     price competition in the contracting of Household Goods Moving Services has been restrained, suppressed, and/or eliminated;

       c.     "Fuel Surcharges" charged by Defendants have been fixed, raised, maintained, and/or stabilized at artificially high, non-competitive levels; and

       d.     Members of the Class have been deprived of the benefit of free and open competition.

80.     During the Class Period, Plaintiff and the members of the Class, as a direct and proximate result of Defendants' antitrust violations, paid excessive "Fuel Surcharges" they would not have paid absent such violations.  Plaintiffs and the members of the Class, therefore, have been injured and financially damaged in their respective businesses and property in an amount to be determined according to proof and are entitled to recover threefold the damages sustained pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

## COUNT TWO: ACTION FOR DAMAGES FOR EXCEEDING TARIFF RATE

81.     Plaintiffs incorporate by reference, as if fully set forth herein, the allegations in the preceding paragraphs of the Complaint.

82.     During the claim period, Defendants engaged in a continuing agreement, undertaking and conspiracy to charge rates that exceed the applicable rate for transportation or service contained in a tariff published under 49 U.S.C. § 13702, and as

such are liable to Plaintiffs pursuant to 49 U.S.C. § 14704(b) for the excessive amounts charged.

## PRAYER FOR RELIEF

83.     **WHEREFORE**, Plaintiffs pray that:

a.     The Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

b.     That the Court certify the Class as follows:  All individuals or entities (excluding governmental entities, Defendants, and Defendants' parents, predecessors, subsidiaries, affiliates, agents and co-conspirators) who purchased Household Goods Moving Services for interstate shipments directly from any of the Defendants, Defendants' co-conspirators, or Defendants' predecessors, subsidiaries, affiliates or agents, at any time during the period within four years prior to the filing of this action.

c.     As to Count One, the Court adjudge and decree that the contract, combination and conspiracy alleged herein is a *per se* unreasonable restraint of trade in violation of Section 1 of the Sherman Act;

d.     As to Count Two, and in the alternative, the Court adjudge and decree that the contract, combination and conspiracy alleged herein resulted in charges that exceeded the applicable rate for transportation or service contained in a tariff under 49 U.S.C. § 13702;

e.     Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiffs and the Class for damages as allowed by law in an amount determined to have been sustained by them;

f.     The Court award Plaintiffs and the Class attorneys' fees and costs, and pre-judgment and post-judgment interest as permitted by law; and

g.     The Court award Plaintiffs and the Class such other further relief as may be necessary and appropriate.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

MARK C. TANENBAUM, P.A.

By: _____s/Mark C. Tanenbaum_____
            **MARK C.  TANENBAUM, Fed ID # 4017**
            mark@tanenbaumlaw.com
            **JOHN P. ALGAR Fed ID # 540**
            john@tanebaumlaw.com
            241-243 East Bay Street
            Post Office Box 20757
            Charleston, SC   29413-0757
            Telephone: (843) 577-5100
            Facsimile:   (843) 722-4688

            and

            RICHARDSON PATRICK WESTBROOK
            & BRICKMAN, LLC

By: _____s/A. Hoyt Rowell, III_____
            **A. HOYT ROWELL, III, Fed. ID # 3665**
            **hrowell@rpwb.com**
            **ROBERT S. WOOD, Fed. ID # 7965**
            **bwood@rpwb.com**
            **T. CHRISTOPHER TUCK, Fed. ID # 9135**
            **ctuck@rpwb.com**
            **DAN O. MYERS, Fed. ID # 9884**
            **dmyers@rpwb.com**
            1037 Chuck Dawley Blvd, Bldg. A  (29468)
            Post Office Box 1007
            Mt. Pleasant, SC   29465
            Telephone: (843) 727-6500
            Facsimile:   (843) 216-9509

            ATTORNEYS FOR PLAINTIFFS

DATED:  March 19, 2007

F:\mct\Moving and Storage\Pleadings\Final Complaint and Exhibits\Moving and Storage Complaint 3-19-07 FINAL.doc-3/19/2007 4:39 PM